IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 3:19-CR-59-TAV-DCP |
| | ) | |
| DAVID NEWMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Judge as may be appropriate. On March 1, 2019, the Government applied for and obtained a search warrant to search the premises of Tennessee Valley Pain Specialists, LLC, ("TVSP"), based upon the supporting affidavit ("Affidavit") of Federal Bureau of Investigation ("FBI") Agent Emily Celeste. Defendant David Newman, a medical doctor who was a co-owner and the Medical Director at TVPS, asks the Court to suppress all evidence seized during the search of TVPS, arguing that the search warrant was issued in violation of his rights under the Fourth Amendment. Specifically, he argues that Agent Celeste's Affidavit fails to provide probable cause for the issuance of a search warrant, because it contains no evidence of the confidential informant's reliability and credibility and it contains deliberately false statements and material omissions. With regard to the alleged false statements and material omissions, Defendant Newman requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

For the reasons detailed below, after reviewing the parties' briefs and exhibits and the relevant legal authorities, the Court finds that Defendant Newman has standing to challenge the search of TVPS. The Court also finds that the Affidavit provides probable cause to support a

1

search of the clinic.  Finally, the Court finds that a *Franks* hearing is not warranted and recommends that the Motion to Suppress Evidence Obtained at TVPS [Doc. 24] be denied.

## I.  BACKGROUND

Defendant Newman is charged [Doc. 1] with conspiring with Steven Mynatt[1] and unnamed others to knowingly, intentionally, and without authority distribute and dispense or cause to be distributed or dispensed controlled substances "outside the usual course of professional practice and not for a legitimate medical purpose," in violation of 21 U.S.C. §§ 841(a)(1) & -(b)(1)(c) & 846.  The Indictment alleges the Defendants illegally distributed the following controlled substances: "hydrocodone, oxycodone, hydromorphone, oxymorphone, morphine (Schedule II controlled substances), and gabapentin (a Schedule V controlled substance)" [Doc. 1].  This charge arises out of Defendant Newman's work at TVPS and from evidence obtained in the March 4, 2019 execution of a search warrant there.

On March 1, 2019, FBI Agent Emily Celeste presented an Affidavit in support of her application for a search warrant to search TVPS, which is described as the medical office of Dr. Steven Mynatt, for evidence, instrumentalities, contraband, and the fruits of violations of the Controlled Substances Act [Doc. 24-1, ¶¶ 1, 5, 7-12].  In the Affidavit, Agent Celeste states that she has been an FBI agent since November 2012 and specializes in health care fraud [Doc. 24-1, ¶ 2].  The Affidavit states that whether a prescription for a controlled substance is issued outside the course of professional conduct or for an illegitimate purpose turns on the facts of each case but

---

[1]Defendant Mynatt, who is a medical doctor and a co-owner of TVPS, is also charged [Doc. 1] with two counts of distributing controlled substances without a legitimate medical purpose and outside the course of professional practice.  Defendant Mynatt entered into a plea agreement [Doc. 36] and is no longer proceeding to trial.

that certain "red flags" indicate that a prescription is not for a legitimate medical purpose or is outside the usual course of professional practice [Doc. 24-1, ¶ 10].

The Affidavit relates that Agent Celeste began investigating Dr. Mynatt in January 2019, based upon his "outlier metrics" for the prescription of opioids and other controlled substances from 2016 to 2018 [Doc. 24-1, ¶ 13]. According to Agent Celeste, the Office of the Inspector General at the Department of Health and Human Services found 90.7% of Dr. Mynatt's Medicare patients[2] received prescriptions for opioids, ranking Dr. Mynatt eleventh nationally for prescribing opioids to Medicare patients [Doc. 24-1, ¶ 18]. Dr. Mynatt began working at TVPS in December 2015, and from 2016 to 2018, he wrote 10,800 prescriptions for Oxycodone HCL and 3,300 prescriptions for Oxymorphone HCL, both of which "pose a high risk for abuse" [Doc. 24-1, ¶ 15].

In the Affidavit, Agent Celeste described four red flags for Dr. Mynatt, based upon her examination of his prescribing practices: First, he wrote opioid prescriptions for a large number of patients in a day [Doc. 24-1, ¶ 16]. The Affidavit gives two examples of days in which he wrote fifty-four (54) opioid prescriptions for twenty-nine (29) patients and sixty-two (62) opioid prescriptions for thirty-five (35) patients [Doc. 24-1, ¶ 16]. Second, a significant portion[3] of his opioid prescriptions were for doses of opioids for which the morphine milligram equivalents ("MME") exceeded ninety (90) per day [Doc. 24-1, ¶ 17]. The Affidavit puts this figure into perspective by stating that the United States Center for Disease Control ("CDC") recommends that

---

[2] The Affidavit specifies that this statistic considers only "non-cancer, non-hospice, non-sickle cell anemia" Medicare patients [Doc. 24-1, ¶ 18].

[3] The Affidavit states that between June 2016 and November 2018, 5,100 of Dr. Mynatt's 17,400 opioid prescriptions exceeded 90 MME per day [Doc. 24-1, ¶ 17]. The Court finds that the Affidavit contends that 29.3% or nearly one-third of Dr. Mynatt's opioid prescriptions exceeded 90 MME per day.

3

doctors treating chronic pain should "'avoid increasing dosage . . . or carefully justify a decision to' increase MME to over 90 MME per day" [Doc. 24-1, ¶ 17].

A third red flag is that Dr. Mynatt often "prescribed large volumes of prescription medications to a single individual in a day, often in combinations that are not medically recommended" [Doc. 24-1, ¶ 19]. In this regard, the Affidavit notes that addicts seek gabapentin, a drug used to treat seizures, to enhance the "high" they get from opioids [Doc. 24-1, ¶ 19]. The Affidavit gives two examples of TVPS patients who received opioid and gabapentin prescriptions from Dr. Mynatt in "combinations and quantities" indicating misuse [Doc. 24-1, ¶ 19-21]. Fourth, the Affidavit states that of the 17,900 prescriptions Dr. Mynatt wrote from 2016 to 2018, 17,600 prescriptions were for opioids [Doc. 24-1, ¶ 22]. These four red flags caused Agent Celeste to believe Dr. Mynatt was prescribing controlled substances outside the course of professional practice and without a legitimate medical purpose [Doc. 24-1, ¶¶ 13-22].

In addition to the red flags inferred from Dr. Mynatt's prescribing practices, Agent Celeste interviewed a confidential source ("CS") on January 9, 2019. The CS, who had been an employee at TVPS since December 2015, said Dr. Mynatt would typically see twenty patients between 8:00 a.m. and noon daily, spending "little time evaluating" each patient [Doc. 24-1, ¶ 23]. This practice continued until December 2018, when Dr. David Newman, who owned TVPS with Dr. Mynatt, required them to spread the patients out so the clinic would not look like a "pill mill" to federal authorities [Doc. 24-1, ¶ 23]. Thereafter, patients were limited to four each hour [Doc. 24-1, ¶ 23].

Agent Celeste also learned that a medical assistant informed CS that D.W., a patient, told Dr. Mynatt that another patient G.M. was "'rounding up'" prospective patients to bring them to TVPS and intended to sell the pills of the patients he or she solicited [Doc. 24-1, ¶ 24]. In response,

4

Dr. Mynatt told CS that they should consider refusing to see D.W., because of D.W's comments about the other patient [Doc. 24-1, ¶ 24].

On January 31, 2019, CS told Drs. Newman and Mynatt about two calls received from an anonymous parent, stating that a TVPS patient J.O. had sold pills to the caller's son and had attempted to buy pills in their neighborhood to make up for a "short" pill count [Doc. 24-1, ¶ 25]. According to CS, Dr. Newman replied that "this was not his problem" and the caller could call the police [Doc. 24-1, ¶ 25]. CS reported that, despite one of the telephone calls being noted in J.O.'s electronic patient file, Dr. Mynatt again prescribed opioids for J.O. on February 27, 2019. Agent Celeste stated this shows that Dr. Mynatt knows J.O. is selling opioids and that J.O's opioid prescription is not medically necessary [Doc. 24-1, ¶ 25].

On February 14, 2019, CS told Agent Celeste that the day before, a patient arrived for an appointment and was five days "short" on pills [Doc. 24-1, ¶ 26]. The Affidavit states that, despite this indication that the patient was abusing pills, Dr. Mynatt refilled the patient's prescriptions "without question" [Doc. 24-1, ¶ 26]. Finally, CS related that Dr. Mynatt had received two letters from a Tennessee agency stating that he is "writing an unusually high number" of opioid prescriptions [Doc. 24-1, ¶ 27]. CS also provided information on where and how records are stored at TVPS [Doc. 24-1, ¶ 28].

Based on the red flags that Agent Celeste inferred from Dr. Mynatt's prescribing practices and the information from CS, Agent Celeste asked the Court to issue a search warrant for TVPS [Doc. 24-1, ¶ 55]. The undersigned United States Magistrate Judge issued the search warrant on March 1, 2019. Law enforcement executed the search warrant at TVPS on March 4, 2020, and seized business records and patient records from various locations in the clinic [Doc. 71, Exh. B].

On January 17, 2020, Defendant Newman filed a Motion and Memorandum to Suppress Evidence [Doc. 24], alleging that Agent Celeste's Affidavit fails to provide probable cause, because it lacks any information on the reliability, credibility, and veracity of the confidential source. The Defendant also contends that the Affidavit contains false statements or statements made with deliberate disregard for the truth and/or material omissions. The Government responded [Doc. 35] in opposition on January 31, 2020. The parties appeared before the undersigned on July 13, 2020, for a hearing on the motion.[4] Assistant United States Attorneys Anne-Marie Svolto and Louis Manzo appeared on behalf of the Government. Attorneys Robert. R. Kurtz and Wesley D. Stone represented Defendant Newman, who was also present.

At the July 13 motion hearing, the parties stipulated to the following facts: TVPS was located at 2805 West Governor John Sevier Highway, Knoxville, Tennessee. The building where TVPS was located is owned by an entity called N&M Properties. David Newman owns two-thirds of N&M Properties, and Steven Mynatt owns one-third of that business. TVSP is a separate business entity, which is also owned by Newman, who owns two-thirds of TVPS, and Mynatt, who owns one-third of TVPS. Defendant Newman was the Medical Director at TVSP. As Medical Director, Newman set the policies and procedures for TVPS. Defendant Newman regularly worked onsite at TVPS one day each week. As Medical Director, Newman had a duty to maintain the patient files at TVPS for ten years. Defendant Newman is still maintaining those files to date. As Medical Director, Defendant Newman also managed the employees at TVPS.

The parties also stipulated that the TVPS patient files were kept electronically on Care Cloud, which is password protected. Other business records of TVPS were not kept on Care Cloud.

---

[4] The Court observes that the parties requested and agreed to multiple continuances of the motion hearing.

Defendant Newman had administrator rights on the TVPS Care Cloud account and, thus, the ability to restrict or deny access to the electronic medical records. Defendant Newman could terminate employee access to Care Cloud. Both the electronic patient records on Care Cloud and paper patient records were treated as confidential, and TVPS patients expected that these records would be kept confidentially. Defendant Newman and the other employees at TVPS had access to the electronic and paper patient files. Paper patient records were scanned and added to Care Cloud and then shredded. At the time of the execution of the search warrant, law enforcement seized paper records that had not yet been scanned.

The parties also stipulated that TVPS was the only business at 2805 West Governor John Sevier Highway, Knoxville, Tennessee, from March 2016 to April 2019, when it closed. Defendant Newman had a key to the building and could come and go freely from the premises. Other employees also had keys and accessed the clinic regularly. Public access to TVPS was limited. Patients were seen by appointment. Patients had to fill out paperwork to be admitted. Defendant Newman had the ability and authority to remove patients from the premises, as did other employees. Defendant Newman had managerial control of TVPS. Defendant Newman shared an office with Dr. Mynatt at TVPS.

Following the parties' presentation of evidence and arguments, the Court permitted post-hearing briefs. Defendant Newman filed a supplemental brief [Doc. 69] on July 23, 2020. The Government filed its post-hearing brief [Doc. 71] on August 3, 2020. On August 19, 2020, the Government requested [Docs. 73 & 74] that an exhibit to its response be filed under seal. The Court granted [Doc. 75] this request on the following day.

## II.    POSITIONS OF THE PARTIES

Defendant Newman asks [Docs. 24 & 69] the Court to suppress all evidence seized during the March 4, 2019 execution of a search warrant at TVPS, arguing that the search warrant was invalid. He contends the Affidavit submitted in support of the search warrant fails to provide probable cause to search TVPS for two main reasons: First, the Affidavit fails to provide any information on the reliability or credibility of the CS or state that law enforcement corroborated any of the information provided by CS. Defendant Newman argues that if the information from the CS is disregarded, the Affidavit fails to provide probable cause for the search warrant. Second, Defendant Newman argues that six portions of the Affidavit contain either deliberately or recklessly false statements or material omissions or both. He contends that if these portions of the Affidavit are excised, then the Affidavit fails to provide probable cause for the search warrant. Defendant Newman requests a *Franks* hearing for the Court to determine whether Agent Celeste deliberately or recklessly included the false statements and omitted material information.

The Government responds [Docs. 35 & 71] that the Defendant does not have an expectation of privacy in TVPS and, thus, lacks standing to challenge the search of the premises. It contends that neither his partial ownership of a limited liability company, nor his managerial status, confers standing and that the Defendant has not shown a subjective expectation of privacy in the premises or in any of the items seized. Alternatively, if the Court finds the Defendant has standing to contest the search, the Government argues that the Affidavit of Agent Celeste provides probable cause for the issuance of the search warrant. It maintains that as an employee of TVPS for four years, CS had a firsthand basis of knowledge for the information provided. Additionally, the CS's information is corroborated by the statistical metrics on Dr. Mynatt's prescribing practices. Finally, CS's description of specific events on specific dates indicates CS is reliable. The

Government also contends that a *Franks* hearing is not warranted, because Defendant Newman has failed to make a prima facie showing that the Affidavit contains deliberately or recklessly false statements or has material omissions. The Government also argues that if the Court finds a Fourth Amendment violation occurred, the exclusionary rule should not be applied, because Agent Celeste acted in good faith.

Defendant Newman responds [Doc. 69] that as a co-owner and the Medical Director of TVPS, he has a legitimate expectation of privacy in TVPS and the medical records contained therein. He contends that his subjective expectation of privacy is objectively reasonable due to the nature of the medical records seized. Thus, he asserts that he has standing to contest the search of TVPS. The Defendant also argues that the good faith doctrine does not apply in this case, because Agent Celeste misled the Magistrate Judge by providing an Affidavit that she knew contained false statements and half-truths and made material omissions. Additionally, he contends that no reasonably well-trained officer would have believed the search warrant was based on probable cause in the absence of any information on the reliability and veracity of the confidential informant.

## III. ANALYSIS

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. In this respect, a judge shall not issue a warrant for the search of a person, home, or personal property except upon a finding of "probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A search warrant issued in compliance with the Fourth Amendment must be based on "particularized facts" that demonstrate "'a fair probability that evidence of a crime will be located on the premises of the proposed search.'" *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)).

9

Here, Defendant Newman contends that although law enforcement searched TVPS pursuant to a search warrant, the search warrant was not based upon probable cause. An issuing judge's determination that probable cause exists is entitled to "'great deference.'" *United States v. Allen*, 211 F.3d 970, 973 (6th Cir.) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)), *cert. denied* 531 U.S. 907 (2000). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. *Id.* "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

The "duty of a reviewing court is simply to ensure that the magistrate [judge] had a substantial basis for concluding that probable cause existed." *Id.* at 238-39. In making this determination, the Court considers only the information that was before the issuing judge—in other words, only what is contained within the four corners of the supporting affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir.), *cert. denied,* 560 U.S. 959 (2010); *see also Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971).

In the instant case, the Defendant brings a two-fold challenge to the probable cause finding: First, he argues that the Affidavit of Agent Celeste fails to provide probable cause, because it does not provide any information on the reliability and credibility of the confidential source. Second, Defendant Newman seeks to pierce the four corners of the Affidavit, asking for a *Franks* hearing, because he contends the affiant deliberately or recklessly provided false statements and omitted material information that is necessary to a finding of probable cause. The Court first considers whether Defendant Newman has standing to challenge the search of TVPS. Then, the Court

examines whether the affidavit provides probable cause for a search warrant, considering the trustworthiness of the CS and the *Franks* arguments in turn.

### A. Standing

The Government contends that Defendant Newman lacks standing to challenge the search warrant for TVPS, because he does not have a legitimate expectation of privacy in the patient files and business records seized from the clinic. It argues that, as a mere investor and manager, Defendant Newman lacks standing to challenge the search of anything other than potentially his personal workspace or his computer. Defendant Newman asserts that, as a part-owner and the Medical Director, responsible for maintaining the patient medical files, he has a legitimate expectation of privacy in all the patient files and business records seized from TVPS.

The Fourth Amendment protection against warrantless searches extends to "commercial premises" as well as homes, *Mancusi v. DeForte*, 392 U.S. 364, 367 (1968), but "[a]n expectation of privacy in a commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home," *New York v. Burger*, 482 U.S. 691, 700 (1987). "It has long been settled that one has standing to object to a search of his office, as well as of his home." *DeForte*, 392 U.S. at 369; s*ee also United States v. Mohney*, 949 F.2d 1397, 1403 (6th Cir. 1991) (observing that "[i]n some circumstances, an officer of a corporation may be a 'person aggrieved' by a corporate search and seizure and thus have standing to challenge the search"), *cert. denied* 504 U.S. 910 (1992). An individual enjoys the protection of the Fourth Amendment in his or her place of business if "the area was one in which there was a reasonable expectation of freedom from governmental intrusion." *DeForte*, 392 U.S. at 368.

First, the Court finds that Defendant Newman's ownership of the property that was searched weighs heavily in favor of a finding that he has standing to challenge the search of TVPS.

11

The Supreme Court has affirmed the right to be free of governmental intrusion upon one's own physical property. *United States v. Jones*, 565 U.S. 400, 404 (2012) (holding a search warrant is required for officers to put a tracking device on the outside of a vehicle, even though the movements of the vehicle are visible to the public). The "most obvious" factor conferring standing is "the person's proprietary or possessory interest in the place to be searched or the item to be seized[.]" *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000) (observing that other factors may also indicate an individual's expectation of privacy). "The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *See v. Seattle*, 387 U.S. 541, 543 (1967).

Although the owner of a commercial property may have a reduced expectation of privacy in that property, the owner nevertheless enjoys some Fourth Amendment protection. *See Dow Chemical Co. v. United States*, 476 U.S. 227, 236 (1986) (observing that "Dow plainly has a reasonable, legitimate, and objective expectation of privacy within the interior of its covered buildings"). Here, the parties stipulated that Defendant Newman co-owns the building where TVPS was housed. As an owner of this commercial property, the Defendant can challenge law enforcement's search of his property. However, the Government argues that the Defendant has not shown an expectation of privacy in the business and medical records seized from TVPS. Thus, the Court examines whether Defendant Newman has an expectation of privacy in TVPS, beyond that conferred from his ownership of the physical location.

The Court also finds that Defendant Newman has a legitimate expectation of privacy in TVPS. "[A] defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001). Whether an individual enjoys a

reasonable expectation of privacy does not turn solely upon the person's subjective belief but also depends upon (1) the person's interest in and control of the place searched, (2) any measures the person took to ensure privacy, and (3) whether society recognizes the individual's expectation as reasonable. *United States v. Padin*, 787 F.2d 1071, 1075-76 (6th Cir.), *cert. denied*, 479 U.S. 823 (1986). In addition to the defendant's "proprietary or possessory interest in the place to be searched," courts have considered "whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises." *King*, 227 F.3d at 744.

In the instant case, the Court finds that evidence of the Defendant's subjective interest in and control of TVPS is strong. He was the majority owner of both the physical building and the clinic. Defendant Newman served as TVPS's Medical Director, a position that gave him managerial authority over all TVPS employees, the ability to set the clinic's policies and procedures, and a legal duty to maintain the patients' medical files. Defendant Newman had control over both the physical property and the medical files at TVPS. He could grant or deny access to both.

The Government challenges Defendant Newman's connection to TVPS, arguing he had no expectation of privacy in records that he did not create for patients that he did not examine. It also argues that Defendant, who only came to TVPS once each week, had no separate workspace. The Government is correct that courts evaluating standing in a commercial setting have looked for a connection between the area searched and the defendant's workspace. *Mohney*, 949 F.2d at 1404 (holding defendant had no "reasonable expectation of privacy in documents he claimed to be completely uninvolved in preparing and which were kept in offices he claimed to rarely visit");

13

*United States v. Bli*, 147 F.Supp.2d 734, 740-41 (E.D. Mich. 2001) (concluding that partner in family business demonstrated no connection to records on farm's operations). Here, Defendant Newman was regularly present at TVPS and had a connection to the patient and business records there. Although Defendant Newman did not create the patient records, he reviewed and, maintained them. Moreover, Defendant Newman shared an office at TVPS with Dr. Mynatt and worked onsite at TVPS one-day each week. *See DeForte*, 392 U.S. at 369 (holding union official had standing to challenge search of files seized from a shared office).

The Court also finds Defendant Newman took measures to protect the privacy of TVPS. The building was locked and only the Defendant and the TVPS employees had keys. Members of the public, i.e. patients, needed an appointment to enter, had to be accepted as patients of the clinic, and could not roam freely throughout the premises. *See United States v. Ferguson*, No. 10-20535, 2012 WL 628509, *5 (E.D. Mich. Feb. 27, 2012) (observing that a construction company's office was not open to the public, although business transactions occurred there); *see also Bli*, 147 F.Supp.2d at 740 (observing that members of public could not look through the business records, nor be in the office unaccompanied); *c.f. Autoworld Specialty Cars, Inc. v. United States*, 815 F.2d 385, 388-89 (6th Cir. 1987) (holding no expectation of privacy in an auto showroom open to the public to browse and make purchases). Defendant Newman also took measures to ensure the privacy of the patients' medical records, which were stored electronically and password protected. Defendant Newman had administrator rights to the Care Cloud program on which the electronic medical records were stored, and he limited access to the medical records to the employees of TVPS.

Finally, the Court finds that society recognizes Defendant Newman's subjective expectation of privacy in TVPS as reasonable. "An owner or operator of a business . . . has an

expectation of privacy in commercial property, which society is prepared to consider to be reasonable." *Burger*, 482 U.S. at 669 (holding that the owner of a business in a closely-regulated industry has a reduced expectation of privacy). In *United States v. Wetselaar*, the court held a physician had standing to contest the search of his medical practice and the seizure of patient files, "because he is not only the sole owner, but also the only physician in the practice, manages and controls the entire business, and has access to the entire medical office." No. 2:11–CR–00347–KJD, 2013 WL 8206582, *5 (D. Nev. Dec. 31, 2013). In the instant case, Defendant Newman was the majority owner, the Medical Director, managed and controlled TVPS, and had access to the entire clinic. Although he did not create the patient files, he had a special duty to oversee and maintain them. The Court finds that Defendant Newman's expectation of privacy in TVPS is one that society would recognize as reasonable.

In summary, the Court finds that Defendant Newman owned the commercial premises that was searched, had a subjective expectation of privacy in TVPS, and his subjective expectation was objectively reasonable. Accordingly, Defendant Newman has standing to challenge the search of TVPS.

### B. Probable Cause

As set out above, the Fourth Amendment requires probable cause for the issuance of a search warrant. Probable cause to search is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* at 244 n.13. Thus, the Supreme Court has observed that "probable cause is a flexible, common-sense standard," causing a person "of reasonable caution" to believe that the items are evidence of a crime. *Texas v. Brown*, 460 U.S. 730, 742 (1983). In other words, probable cause

is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances. *Gates*, 462 U.S. at 238.

The Court also reiterates that the issuing judge's determination that probable cause exists is entitled to "'great deference.'" *Allen*, 211 F.3d at 973 (quoting *Gates*, 462 U.S. at 236). The reviewing court's sole consideration is whether the issuing judge "had a substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 238-39. In making this determination, the Court considers only the information that was before the issuing judge–in other words, only what is contained within the four corners of the supporting affidavit. *United States v. Hatcher*, 473 F.2d 321, 323 (6th Cir. 1973).

Defendant Newman argues that Agent Celeste's Affidavit does not provide probable cause for the search warrant, because it contains no information on the reliability of the confidential informant. He also argues that the Affidavit contains deliberately or recklessly false statements and material omissions and that when these false statements are removed or material omissions considered, the Affidavit fails to provide probable cause.

### (1) Reliability and Credibility of Confidential Source

Agent Celeste's Affidavit in support of the search warrant relies on information provided by a confidential source, who was an employee at TVPS. Defendant Newman argues that the Affidavit fails to provide the issuing judge with any reason to believe the statements of the CS, because the CS was not identified to the judge, the affidavit contains no information on the CS's reliability or credibility, and law enforcement did not corroborate any information provided by the CS. The Defendant argues that the information from the CS must be eliminated from consideration

and, in its absence, the Affidavit fails to provide probable cause. The Government maintains that the Affidavit shows the CS is reliable and credible, because it identifies the CS as an employee of TVPS and the CS provides details of specific events that occurred on specific dates. Additionally, the Government asserts that Agent Celeste's research on Dr. Mynatt's prescribing practices corroborates some of the information from the CS.

If probable cause to issue a search warrant is gained from information provided by a confidential source, the issuing judge must have a basis for finding that the source is reliable or credible and was in a position to know the information provided. *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009); *see also Gates*, 462 U.S. at 233 (holding that a confidential informant's reliability and basis of knowledge are "relevant considerations in the totality-of-the-circumstances analysis"); *Allen*, 211 F.3d at 972-73. An informant's veracity or reliability and basis of knowledge are not rigid categories. *Id.* Instead, deficiencies in one aspect can be made up by a strong showing in the other. *Gates*, 462 U.S. at 232-33; *Allen*, 211 F.2d at 981.

Additionally, information provided by a confidential informant can be independently corroborated by law enforcement. *United States v. Jones*, 159 F.3d 969, 974 (6th Cir. 1998). When the affidavit contains no information on the informant's reliability, the independent police corroboration must be substantial. *United States v. Neal*, 577 F. App'x 434, 440 (6th Cir. 2014), *cert. denied*, 574 U.S. 1094 (2015); *United States v. Coffee*, 434 F.3d 887, 893 (6th Cir. 2006). Police do not necessarily have to corroborate the criminal conduct observed by the informant; instead, corroboration of un-incriminating facts can be sufficient to establish probable cause. *Gates*, 462 U.S. at 243-44. "It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or

17

prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" *Id.* at 244-45 (quoting *Jones v. United States*, 362 U.S. 257, 269, 271 (1960)).

Our appellate court has "identified three categories of informants: (1) named informants; (2) confidential informants, who are known to the affiant but not to the magistrate; and (3) anonymous informants, who are known to no one but the informant." *United States v. Ferguson*, 252 F. App'x 714, 720 (6th Cir. 2007). In the instant case, the CS falls into the second category, in that his or her identity was known to Agent Celeste but was not revealed to the judge. The affiant must provide additional information about the veracity, reliability, and basis of knowledge for informants in the second category. *Id.* at 721. "These factors[—veracity, reliability, and basis of knowledge—] are not evaluated independently; rather, the presence of more of one factor makes the others less important. For instance, the more reliable the informant, the less detail the informant must provide in his tips before a magistrate can find probable cause." *Id.*

In the instant case, the Affidavit states that the CS is an employee of TVPS, who has worked there since the clinic opened in December 2015. The Affidavit does not make any representations about CS's truthfulness, nor does it state that law enforcement has found that CS provided reliable information in the past.[5] The Affidavit does, however, give information about the source's relationship to the affiant. *See Frazier*, 423 F.3d at 532 (stating the relationship between the affiant and informant is one factor from which the reviewing judge may assess reliability). Here, the Affidavit states that Agent Celeste and another agent interviewed CS on January 9, 2019 [24-1, ¶ 23]. Following this interview, the CS provided information to Agent

---

[5] The Government provides [Doc. 71, pp. 24-25] an affidavit of Agent Celeste, dated August 3, 2020, in which Agent Celeste states that other agents had worked with CS "on a different matter" and found CS to be "trustworthy and reliable over a period of years." The Court cannot consider this new information from Agent Celeste, because it is outside the four corners of the search warrant.

Celeste on at least two other occasions, January 31, 2019, and February 14, 2019 [24-1, ¶¶ 25-26].

Accordingly, the Court finds that the Affidavit shows that the CS was providing information to Agent Celeste over a period of at least five weeks. *C.f., Neal*, 577 F. App'x at 442 (observing the affidavit contained no information that the agent "had ever met or even spoken with CS1 prior to swearing the Affidavit"). Agent Celeste's direct contact with CS indicates that Agent Celeste had personal knowledge of the source's statements, during the time that she was investigating Dr. Mynatt's prescribing practices.

Additionally, the Affidavit provides substantial information for the CS's basis of knowledge. The CS was an employee at TVPS at the time she was providing information to Agent Celeste. The Affidavit states that CS has worked at TVPS for the entire time it has been open. From the information provided by the CS, it appears that the CS has access to the electronic medical records and knows where the business and medical records are stored. Additionally, the CS provided detailed accounts of conversations and events at TVPS along with the dates on which they occurred. "[A]n 'explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [the informant's tip] to greater weight than might otherwise be the case[.]'" *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996) (quoting *United States v. Sonagere*, 30 F.3d 51, 53 (6th Cir. 1994)). Here, the CS gave detailed descriptions of Dr. Mynatt's work at the clinic, interaction with patients and staff, and conversations about patients. Most of the information provided by the CS was observed firsthand.

Relying on *United States v. Neal*, the Defendant argues that a firsthand basis of knowledge and a detailed statement do not confer reliability. 577 F. App'x at 443. Relying on the dissenting opinions in two prior Sixth Circuit cases, the court stated

> By relying primarily on the level of detail provided in statements to
> assess their reliability, courts are apt to mistake the best storytellers

> for the most truthful informants. In other words, "[i]f detail is all that is needed to support a search warrant, the Fourth Amendment will no longer be any constraint or check on the issuance of search warrants. Any 'detailed' information, uncorroborated by the police, from virtually any unknown, unreliable source, would support issuance of a search warrant." *Sonagere*, 30 F.3d at 55 (Merritt, J. dissenting).

*Id.* (also citing *Dyer*, 580 F.3d at 394 (Moore, J, dissenting)). However, in the instant case, CS is neither "unknown" or uncorroborated. The confidential informant in *Neal* approached FBI agents in a different state from that of the affiant, seeking to provide information in exchange for reduction of her fiancé's sentence for an unrelated narcotics conviction. *Id.* at 436 & 442 n.3. In the instant case, Agent Celeste knew and personally met with CS, who was an employee at TVPS. "'The statements of an informant . . ., whose identity was known to the police and who would be subject to prosecution for making a false report, are thus entitled to far greater weight than those of an anonymous source.'" *Dyer*, 580 F.3d at 391 (quoting *United States v. May*, 399 F.3d 817, 824-25 (6th Cir. 2005)). The Sixth Circuit continues to rely on this factor to establish reliability of a confidential informant, even after its decision in *Neal*. *See United States v. Jones*, 781 F. App'x 423, 426-27 (6th Cir. 2019). Here, the Court finds that CS's strong basis of knowledge makes up, at least in part, for the absence of information on CS's veracity or reliability.

Additionally, the Court finds that Agent Celeste's research into Dr. Mynatt's prescribing practices corroborates some of the information provided by the CS. The CS stated that before December 2018, Dr. Mynatt was writing prescriptions for around twenty patients per day, between the hours of 8:00 a.m. and noon [Doc. 24-1, ¶ 23]. The CS reported that the Defendant was concerned that Dr. Mynatt's practice of seeing this many patients in a four-hour timeframe would attract the attention of federal authorities [Doc. 24-1, ¶ 23]. Agent Celeste stated that prescription records reveal that Dr. Mynatt wrote opioid prescriptions for "an unusually large number of

patients in a single day," giving examples of twenty-nine patients on November 21, 2016, and thirty-five patients on November 23, 2016 [Doc. 24-1, ¶ 16]. The CS also told Agent Celest that Dr. Mynatt received two letters from a Tennessee agency about him "writing an unusually high number" of opioid prescriptions [Doc. 24-1, ¶ 27]. Agent Celeste's research into Dr. Mynatt's prescribing practices also revealed that he prescribed an unusually high number of opioid prescriptions. Agent Celeste found that of Dr. Mynatt's 17,900 prescriptions written between 2016 and 2018, all but 300 were for opioids or a "cocktail" that included opioids [Doc. 24-1, ¶ 22]. Agent Celeste also stated that a federal agency had flagged Dr. Mynatt for prescribing opioids to 90.7% of his Medicare patients and ranked him eleventh in the nation Medicare patients receiving opioids [Doc. 24-1, ¶ 18]. Thus, the Court finds that Agent Celeste independently corroborated some of the CS's information.

The Defendant argues that the CS did not provide any information about future events that law enforcement could corroborate. However, the Court finds the corroboration provided by Agent Celeste's research into the prescribing practices of Dr. Mynatt is significant, because it provides support to CS's statement that Dr. Mynatt "often prescribes patients opioids without properly evaluating the patient" [Doc. 24-1, ¶ 23]. As a medical doctor, Dr. Mynatt could legally write prescriptions. As a doctor in a pain management clinic, he both could and logically would write prescriptions for opioids. In order to issue the search warrant, the judge had to find probable cause that Dr. Mynatt was writing prescriptions without a legitimate medical purpose and outside the scope of professional practice. Agent Celeste's corroboration of the CS's information that Dr. Mynatt was seeing a large number of patients per day is information that is critical to probable cause.

Based upon the CS's significant basis of knowledge and Agent Celeste's corroboration of some of the information through independent sources, the Court finds the affidavit provides a basis for concluding the CS is credible, reliable, and was in a position to know the information provided. Though Agent Celeste's corroboration of the CS's information was not extensive, it was enough to assure the CS's allegations about the Defendant and Dr. Mynatt were not "a reckless or prevaricating tale." *See Gates*, 462 U.S. at 245. The Court also continues to find that the information from CS, along with the red flags inferred by Agent Celeste, based upon her research of Dr. Mynatt's prescribing practices, provided a substantial basis for a finding of probable cause to issue the search warrant.

### (2) *Franks Challenge*

The Defendant argues that the Affidavit contains both affirmative false statements and material omissions, which the affiant made with a reckless disregard for the truth. He contends, that when these false statements are omitted and material omissions are considered, the Affidavit fails to provide probable cause to support the issuance of a search warrant. The Defendant requests a *Franks* hearing to show that Agent Celeste, either deliberately or with reckless disregard for the truth, made false statements and material omissions in the Affidavit.

As discussed above, the reviewing court's evaluation of whether an affidavit establishes probable cause is typically limited to only the information that was before the issuing judge, i.e., only what is contained within the four corners of the supporting affidavit. *Brooks*, 594 F.3d at 492. "In a *Franks* hearing, a court determines whether to suppress the fruits of an executed search warrant, where the warrant was the result of a false statement." *United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). "A defendant challenging the validity of a search warrant's affidavit bears a heavy burden." *United States v.*

*Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). The affidavit supporting a search warrant is presumed to be valid. *Franks*, 438 U.S. at 171. A defendant seeking a *Franks* hearing, "must make a 'substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.'" *Crawford*, 943 F.3d at 309 (quoting *Franks*, 438 U.S. at 171). "'The allegedly false statement,' moreover, must be 'necessary to the finding of probable cause.'" *Id.*

In *Crawford,* our appellate court described the "two questions of fact, and one of law," upon which "[a] *Franks* analysis turns:"

> The two questions of fact: One, is there a false statement included in an affidavit? If so, then two, how culpable is the affiant officer in including that statement in the affidavit? Where the affidavit does include a false statement, and where the officer making the statement was culpable in doing so, then the court turns to a question of law: After excising the false statement, is there sufficient information in the affidavit to constitute probable cause to issue a warrant?

943 F.3d at 309. Moreover, the defendant seeking a *Franks* hearing, must make a substantial showing of the affiant's culpability:

> The bottom line [in *Franks* was] that an evidentiary hearing on the affidavit's truthfulness was required *only* if the defendant alleged "deliberate falsehood or . . . reckless disregard for the truth." [*Franks*, 438 U.S. at 171]. "Allegations of negligence or innocent mistake," the Court emphasized, would be "insufficient." *Id.* And the allegations of deliberate or reckless falsehood "must be accompanied by an offer of proof." *Id.* Even having satisfied these steps, a defendant must still show that "when material that is the subject of the alleged falsity or reckless disregard is set to one side," the affidavit's remainder no longer demonstrates probable cause. *Id.* at 171–72. Only then is a defendant entitled to a *Franks* hearing to prove his allegations. *Id.* at 172. *Franks* thus drew an evidentiary line with reference to the well-known common-law scienter standards: negligence, recklessness, and willfulness. *See* Restatement (Second) of Torts §§ 8A, 282, 500 (1965). Only "substantial" evidence tending to show one of the two more culpable mental states, *Franks* said, would do.

23

*Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019). An officer's statement is only considered to be issued with "reckless disregard for the truth" if the defendant shows the affiant subjectively entertained "serious doubts as to the truth" of his allegations. *Bateman*, 945 F.3d at 1008 (6th Cir. 2019). "Allegations of [an officer's] negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171.

Material omissions may also merit a *Franks* hearing in certain circumstances; however "an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Adkins*, 107 F.3d 1213, 1217 (6th Cir. 1997). Thus, "except in the very rare case where the defendant makes a strong preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts." *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir.), *cert. denied*, 524 U.S. 942 (1998). "If the defendant does succeed in making a preliminary showing that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must then consider the affidavit including the omitted portions and determine whether probable cause still exists." *Adkins*, 107 F.3d at 1217.

To demonstrate entitlement to a *Franks* hearing, Defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false." *Franks*, 438 U.S. at 170; *see United States v. Green*, 572 F. App'x 438, 442 (6th Cir. 2014) (observing that "this court's well-settled framework for *Franks* hearings requires a defendant to 'point to specific false statements.'") (quoting *United States v. Cummins*, 912 F.2d 98, 103 (6th Cir. 1990)). Defendant Newman points

24

to six portions of the Affidavit that he contends contain either false statements or material omissions or both:

> (1) Paragraph 17 of the Affidavit states that the CDC guidelines recommend that doctors treating chronic pain should avoid or closely scrutinize prescriptions for opioids with an MME of 90 or more. Paragraph 17 states that Dr. Mynatt regularly wrote opioid prescriptions for 90 MME, which is a red flag that the prescriptions were not legitimate. The Defendant argues that it is a material omission that Agent Celeste did not include that the cited portion of the CDC guidelines are for primary care physicians, that the Tennessee Chronic Pain Guidelines set a different MME than the CDC, that Dr. Mynatt was supervised by a pain management specialist, or that Drs. Newman and Mynatt were in compliance with all Tennessee rules.

> (2) The Defendant maintains that Paragraph 19 contains a recklessly false statement that Dr. Mynatt wrote two prescriptions for gabapentin and three prescriptions for opioids for patient C.P. on September 11, 2018. Defendant contends that the CSMD practitioner profile for Dr. Mynatt shows that he wrote one prescription for gabapentin, one prescription for oxymorphone, and one prescription for oxycodone for C.P. on September 11, 2018.

> (3) Defendant Newman alleges that Paragraph 20 contains a recklessly false statement that Dr. Mynatt wrote five prescriptions (three for gabapentin, one for oxycodone, and one for oxymorphone) for patient D.N. on September 18, 2018. He contends that Dr. Mynatt's CSMD practitioner profile shows that Dr. Mynatt wrote only three prescriptions for D.N. on September 18, 2018—one each for oxycodone, oxymorphone, and gabapentin.

> (4) The Defendant contends that Paragraph 25, which relates to telephone calls reporting that patient J.O. was diverting opioids, contains a false statement that Defendant Newman said this was not his problem. He asserts that an audio recording of that conversation reveals that Dr. Mynatt, not he, made that statement. The Defendant maintains that the audio recording also reveals a material omission: When told of the telephone complaints about J.O., Defendant Newman reviewed J.O.'s file and concluded that it showed J.O. was taking her prescribed medication.

> (5) Defendant argues that Paragraph 26 contains a material misstatement and a material omission. It states that patient F.B. came to an appointment "short" on pills on February 13, 2019, yet Dr. Mynatt prescribed F.B. more opioids "without question." The Defendant contends this statement is false because the encounter notes in F.B.'s patient file state that F.B. was counseled to take the medication as prescribed and also told not to fill the new opioid prescription until the date the earlier prescription would have expired. Agent Celeste did not include this information in the Affdiavit.

(6) Finally, the Defendant contends that Affidavit fails to state that law enforcement paid the confidential source $3,000 for her cooperation. The Defendant argues that this is a material omission, especially in light of the absence of any information on CS's reliability or veracity and law enforcement's failure to corroborate the CS's information.

The Government contends that the cited portions of the Affidavit are not false, that the alleged omissions were not material, and, most importantly, that the Defendant has failed to show that Agent Celeste intentionally or recklessly included false statements or made material omissions. The Court looks at each allegation to determine whether it was false statement and/or a material omission, whether the Defendant has shown Agent Celeste to be culpable, and whether the statement is necessary to probable cause.

### (a) The significance of prescriptions for opioids of 90 MME or above

Defendant Newman argues that the affiant made material omissions with regard to the significance of Dr. Mynatt writing prescriptions that exceeded 90 MME per day. The Affidavit states the CDC recommends that doctors treating chronic pain should avoid or "carefully justify" prescriptions that exceed 90 MME per day [24-1, ¶ 17]. The Affidavit states that Dr. Mynatt's CSMD data reveals that he often writes prescriptions for opioids that exceed 90 MME per day and that this is a red flag that he is writing illegitimate prescriptions [24-1, ¶ 17]. Defendant Newman argues that Agent Celeste failed to include that the referenced CDC guidelines are for primary care physicians, not physicians working in a pain clinic supervised by a board-certified pain management specialist. He contends that the Affidavit also fails to include that the Defendant, who supervises Dr. Mynatt, is a pain management specialist and that this allows Dr. Mynatt to prescribe over 120 MME of opioids in certain circumstances. He also asserts that Agent Celeste omitted that the Tennessee Chronic Pain Guidelines set different MME recommendations than the CDC and that Drs. Mynatt and Newman were in compliance with all Tennessee rules.

26

The Government argues that the Affidavit's statements regarding the CDC guidelines are not misleading. First, it contends that the Affidavit expressly relates that the CDC guidelines are just recommendations and does not imply they are binding. Second, the Government argues that Dr. Mynatt is a urologist without any pain management certification and, thus, the cited guidelines apply to him. Additionally, the Government argues that the CDC guidelines do not speak to a primary care doctor who is supervised by a pain management specialist. Also, it questions whether the Defendant provided any meaningful supervision of Dr. Mynatt, given that he was only at the clinic one day per week. It maintains that Agent Celeste had no duty to include the Tennessee Chronic Pain Guidelines or Dr. Mynatt's compliance with state rules. Finally, the Government argues that Defendant Newman has made no showing that the affiant intentionally misled the Court by including only this one part of the CDC guidelines.

The Court finds that Agent Celeste did not make material omissions with regard to paragraph 17. First, although the Affidavit does not specify that the CDC guideline cited is directed to primary care physicians, it does expressly state that the guideline is a recommendation. Also, it is clear from the quoted language that prescriptions of more than 90 MME are not prohibited. Finally, it is also clear from the Affidavit that TVPS is a pain clinic. Accordingly, the Court does not find the alleged omissions are material to the judge's understanding of Dr. Mynatt's prescribing practices. Moreover, as noted by the Government, the Defendant has made no showing that Agent Celeste deliberately or recklessly failed to include the alleged omissions.

*(b) Incorrect number of prescriptions attributed to C.P.*

Defendant Newman also argues that Paragraph 19 contains a recklessly false statement that Dr. Mynatt wrote two prescriptions for gabapentin and three prescriptions for opioids for patient C.P. on September 11, 2018. At the July 13 evidentiary hearing, the Defendant introduced a

27

Prescriber Rx History Report for Dr. Mynatt from the Tennessee Department of Health Controlled Substances Monitoring Program: Board of Pharmacy [Def. Exh. 1]. Relying on this record [Def Exh. 1], Defendant asserts that Dr. Mynatt wrote one prescription for gabapentin, one prescription for oxymorphone, and one prescription for oxycodone for C.P. on September 11, 2018. Defendant Newman states that the record [Def. Exh. 1] reveals that C.P. filled a single prescription for gabapentin and a single prescription for oxycodone on September 12, 2018. The record [Def. Exh. 1] shows that C.P. partially filled the oxymorphone prescription on September 12, 2018, receiving ten pills, and returned to obtain the remaining forty-six pills on the following day, September 13, 2018. The Defendant contends that Dr. Mynatt's Prescriber Rx History Report also shows that C.P. refilled the September 11, 2018 prescription for gabapentin on November 6, 2018; December 1, 2018; January 4, 2019; and February 15, 2019 [Def. Exh. 2].

The Government argues that the statement that Dr. Mynatt wrote four prescriptions[6] for C.P. on September 11, 2018, is not false, because the Affidavit only provides the date the prescriptions were written and says nothing about when they were filled. It contends that the Affidavit's statement that Dr. Mynatt wrote four prescriptions for C.P. on September 11, 2018, is accurate based on the practitioner profile for Dr. Mynatt, which the Government attached as a sealed exhibit [Doc. 74, SEALED] to its post-hearing brief. The Court finds that the sealed exhibit provided by the Government supports the Defendant's position that Dr. Mynatt wrote three prescriptions for C.P. on September 11, 2018. The Government's exhibit [Doc. 74, SEALED], like the Defendant's exhibit [Def. Exh. 1], shows that the same oxymophone prescription (prescription number 861729), issued on September 11, 2018, was filled on two days.

---

[6] Paragraph 19 states that "on September 11, 2018, CSMD data shows that MYNATT prescribed patient C.P. four separate prescriptions." Paragraph 19 also contains a chart that lists five prescriptions for C.P., two for gabapentin, two for oxymorphone, and one for oxycodone.

The Government also argues that the fact that the Affidavit states Dr. Mynatt wrote multiple gabapentin prescriptions for C.P. on September 11, 2018, rather than one gabapentin prescription with refills, is not important to probable cause. The Government points out that the Affidavit states that gabapentin is a potentiator for opioids. It contends that it is not the number of gabapentin pills provided, but the fact that gabapentin is written in conjunction with opioids, that is the red flag. The Government argues that a single gabapentin prescription also raises this red flag.

The Court finds that the Affidavit contains a false statement regarding the number of prescriptions that Dr. Mynatt wrote for C.P. on September 11, 2018. The exhibits provided by the parties show that Dr. Mynatt wrote three prescriptions for C.P. on that date, one each of gabapentin, oxycodone, and oxymorphone. The Court finds the record is devoid of evidence that Agent Celeste deliberately or recklessly, rather than negligently, misinterpreted the practitioner profile. Moreover, regardless of Agent Celeste's culpability, the Court finds the false statement is not essential to probable cause. Paragraph 19 states that Dr. Mynatt "frequently prescribed large volumes of prescription medications to a single individual in a day, often in combinations that are not medically recommended." Paragraph 16 also states that Dr. Mynatt wrote multiple opioid prescriptions for patients in a single day. Paragraph 19 states that gabapentin is a seizure drug that addicts seek as a potentiator of opioids and that Dr. Mynatt wrote 369 gabapentin prescriptions between June 2016 and November 2018. The Court finds that even if the example of the prescriptions written for C.P. was stricken from the Affidavit, it would not affect probable cause.

(c) *Incorrect number of prescriptions attributed to D.N.*

Defendant Newman also alleges that Paragraph 20 contains a recklessly false statement that Dr. Mynatt wrote five prescriptions (three for gabapentin, one for oxycodone, and one for

oxymorphone) for patient D.N. on September 18, 2018. In support of this argument, the Defendant introduced Dr. Mynatt's Prescriber Rx History Report from the Tennessee Department of Health's Controlled Substance Monitoring Program: Board of Pharmacy [Def. Exhs. 3 & 4]. He contends that Dr. Mynatt's prescriber report shows that Dr. Mynatt wrote only three prescriptions for D.N. on September 18, 2018—one each for oxycodone, oxymorphone, and gabapentin [Def. Exhs. 3 & 4]. The report shows that D.N. filled three prescriptions—one each for oxycodone, oxymorphone, and gabapentin—on September 18, 2018 [Def. Exhs. 3 & 4]. It also shows that D.N. refilled the gabapentin prescription five times at monthly intervals [Def. Exh. 4].

The Government makes the same arguments for D.N., as it did for C.P., contending that the Defendant cites to different CSMD data that than upon which Agent Celeste relied in drafting the Affidavit. It argues that the Affidavit's statement that Dr. Mynatt wrote five prescriptions for C.P. on September 11, 2018, is accurate based on the practitioner profile for Dr. Mynatt, which the Government attached as a sealed exhibit [Doc. 74, SEALED] to its post-hearing brief. The Government's exhibit [Doc. 74, SEALED] does include three entries for gabapentin prescribed by Dr. Mynatt for D.N. on September 18, 2018. However, each of these gabapentin prescriptions has the same prescription number (4014829) and each was filled on a different date approximately one-month apart. Accordingly, the Court finds the Government's exhibit also supports the Defendant's contention that Dr. Mynatt wrote one gabapentin prescription for D.N. on September 18, 2018, that could be refilled.

The Court finds that paragraph 20 falsely states that Dr. Mynatt "wrote patient D.N. the following five separate prescriptions:" thereafter listing three gabapentin prescriptions in a chart. However, like with patient C.P., the Court finds Defendant Newman made no showing that Agent

Celeste deliberately or recklessly, rather than negligently, included this false statement. Also, like with C.P., the Court finds that the example of D.N. is not necessary to probable cause.

(d) *Anonymous complaints about J.O.*

The Defendant contends that Paragraph 25 falsely attributes to him the statement that patient J.O.'s reported diversion of opioids was "not his problem." He argues that a recording of the conversation made by the CS shows that Dr. Mynatt made that statement. Defendant Newman also argues that paragraph 25 contains a material omission. He contends that the recording shows that he reviewed J.O.'s chart, in response to the CS telling him and Dr. Mynatt that an anonymous caller reported J.O. sold opioids to his or her son and attempted to buy opioids in his or her neighborhood. The recording reveals that J.O.'s prior urine test showed she was taking her prescribed medication. The Defendant contends that Agent Celeste had the recording from the CS before she applied for the search warrant. Thus, he maintains that the failure to include the information that he checked J.O.'s file was a material omission from the Affidavit.

The Government argues that paragraph 25 does not contain a false statement. The Affidavit states that after CS told both Drs. Newman and Mynatt about the phone calls reporting that J.O. was buying and selling pills, "Newman responded, with MYNATT in the room, that this was not his problem, and that the caller could contact the police" [Doc. 24-1, ¶ 25]. The Government asserts that Agent Celeste accurately and succinctly summarized the recording, in which Defendant Newman states, "if someone is selling pills, then call the police. That is the police's job to investigate and prosecute" [Doc. 71, p.16 (quoting Def. Exh. 6)]. Moreover, the Government disputes the Defendant's contention that it was Dr. Mynatt, rather than he, who said J.O's diverting pills was not his problem. However, the Government argues that which of them made that statement does not affect whether there is probable cause to search the clinic. Finally, the

31

Government argues that while the Defendant can argue that he checked J.O.'s file or that he supervised Dr. Mynatt's subsequent prescription for J.O. at trial, this is not an appropriate basis for a *Franks* hearing.

The Court has reviewed the audio recording obtained by the CS [Def. Exh. 6]. Although it appears that Dr. Mynatt may have been the one who uttered the words "not my problem," the Court makes no specific finding in that regard, because both Dr. Mynatt and the Defendant agreed that investigation of the caller's claim that patient J.O. was diverting pills was a matter for the police. Moreover, the Court agrees with the Government that whether Dr. Mynatt or the Defendant made the statement does not affect probable cause or provide a basis for a *Franks* hearing.

The alleged material omission, however, is more problematic. The recording [Def. Exh. 6] reveals that CS informed the Defendant and Dr. Mynatt of several calls from a parent claiming that J.O., a patient at the clinic, was selling pills to the caller's son. During their conversation on what should be done about these calls, the Defendant checked J.O's electronic medical records. According to the Defendant, J.O.'s urine screens revealed that J.O. had been taking her prescribed medications. The Defendant opined that they had no evidence that J.O. was diverting her medication. The Defendant stated the caller should be told to contact the police. Paragraph 25 does not relate that the Defendant checked J.O's medical records and found them to be consistent with her taking her medication rather than diverting it. Instead, paragraph 25 continues as follows:

> According to C.S., one of these calls is described in the patient file for J.O., which is maintained on the computers [at] the TARGET PREMISES. On February 27, 2019, MYNATT again prescribed J.O. opioids, according to C.S. Based on my training and experience, and conversations with other law enforcement officers, I believe that if MYNATT has information that J.O. is selling her opioids, he is likely aware that his prescriptions to her is medically unnecessary.

[Doc. 24-1, ¶ 25].

The Court finds the omitted information to be material, because it calls into question Agent Celeste's conclusion that Dr. Mynatt was aware that J.O's prescriptions are not medically necessary. In contrast, the recording reveals the Defendant confirmed in Dr. Mynatt's presence that J.O.'s medical records show that she is taking her medications, rather than diverting them. The Court finds that Agent Celeste had the recording prior to applying for the search warrant. However, she chose to omit Defendant Newman's check of J.O.'s electronic medical records and the Defendant's finding that there was no evidence that J.O. was diverting pills from the Affidavit. Instead, Agent Celeste included the opposite conclusion that Dr. Mynatt was aware J.O.'s prescription was unnecessary in the Affidavit. This is at least circumstantial evidence that Agent Celeste deliberately omitted this information. *But see Mays*, 134 F.3d at 816 (observing the defendant must make "a strong preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit").

However, the Court need not dwell on whether Defendant's showing of Agent Celeste's culpability is sufficient, because the Court finds that the information in paragraph 25 is not critical to probable cause. Even if paragraph 25 was excised from the Affidavit, the CS reported that Dr. Mynatt prescribed opioids without properly evaluating patients, ignored a report that a patient was sponsoring other patients in order to sell their pills, and continued to prescribe opioids to a patient who was "short" on pills [Doc. 24-1, ¶¶ 23, 24, & 26]. Accordingly, Agent Celeste's material omission in paragraph 25 does not warrant a *Franks* hearing.

(e) *Short pill count for F.B.*

Defendant Newman contends that paragraph 26 of the Affidavit contains both a false statement and a material omission. Paragraph 26 states that CS told Agent Celeste that patient F.B. was five days "short" on pills when she arrived for an appointment at TVPS on February 13,

33

2010. The Affidavit states that despite this, Dr. Mynatt "refilled F.B.'s prescriptions without question" [Doc. 24-1, ¶ 26]. The Defendant argues that this is demonstrably false. At the motion hearing, the Defendant presented F.B.'s medical records [Def. Exh. 7] from his February 13, 2019 appointment with Dr. Mynatt. The exhibit notes that F.B.'s pill count was short because the patient "over took" the medication [Def. Exh. 7]. The exhibit states that F.B. is not to fill the new prescription until February 21, 2019, and that F.B. was counseled to take the medication as prescribed [Def. Exh. 7]. In his affidavit,[7] the Defendant states he has reviewed the encounter notes from F.B.'s file and that F.B. was counseled to take the medication as prescribed and instructed not to fill the new prescription until the date the former prescription would have been completed. As pointed out by the Government, Agent Celeste did not have access to F.B.'s patient file at the time she applied for the search warrant. Accordingly, the Court finds no evidence that Agent Celeste knew that F.B. had been counseled or instructed to delay refilling the new prescription. In other words, the Defendant makes no showing that Agent Celeste made a deliberately or recklessly false statement or omission in paragraph 26.

      *(f) Compensation of the CS*

The Defendant argues that Agent Celeste made a material omission in failing to include that the confidential source was paid $3,000 for providing information in this case. In support of this payment, the Defendant introduced an FBI report of May 17, 2019 [Def. Exh. 15]. This report states that the CS "was paid $3,000 by FBI today" [Def. Exh. 15]. The Government argues that this payment is not a material omission, because at the time of the Affidavit, this payment had not been made. It provides the August 3, 2020 affidavit [Doc. 71, Exh. A] of Agent Celeste, who

_____

[7] The affidavit of Defendant Newman was accepted for identification only [Def. Exh. 8] at the motion hearing.

states that "[p]rior to the search warrant, the confidential source never asked about any type of financial remuneration and I never discussed financial remuneration with the source."  Agent Celeste states that before applying for the search warrant, the FBI purchased lunch at a restaurant for $16.50 for CS.  The Court finds that the failure to include the $3,000 payment to the CS was not a material omission, because the payment had not been made at the time Agent Celeste applied for the search warrant.[8]

In summary, the Court has examined each of the Defendant's allegations of false statements and material omissions and found that they do not merit a *Franks* hearing.  Although the Court finds the Affidavit includes two false statements regarding the number of prescriptions written for C.P. and D.N., the Court finds both no evidence that Agent Celeste deliberately or recklessly made these statements, and that the examples of C.P. and D.N. are not necessary to probable cause.  The Court also finds that Agent Celeste omitted material information in failing to include that the Defendant checked patient J.O.'s medical records and found no evidence that J.O. was diverting pills.  However, even if Agent Celeste deliberately or recklessly omitted this information, it, too, was not critical for probable cause.  Accordingly, the Court finds the Affidavit of Agent Celeste provides probable cause to support the search warrant for the search of TVPS.

### C.  Exclusionary Rule and Good Faith Exception

The Government argues that if the Court finds that the Affidavit fails to provide probable cause, the Court should not suppress the evidence seized in the execution of the search warrant at TVPS, because law enforcement searched the clinic in good faith reliance on the search warrant.

---

[8]The Court notes that the information in Agent Celeste's August 3, 2020 affidavit that other FBI agents had worked with the CS and found her truthful and reliable over several years would have been material to the probable cause finding, in that it would have enhanced the credibility and reliability of the CS.  However, the failure to include this information does not detract from the Affidavit's probable cause.

Although the Supreme Court recognizes a good faith exception to the exclusionary rule, *see United States v. Herring*, 555 U.S. 135, 139-40 (2009) and *United States v. Leon*, 468 U.S. 897, 909 (1984), the Court need not analyze whether such exception applies in the instant case. The Court has found no Fourth Amendment violation, so neither the exclusionary rule, nor the good faith exception, applies in this case.

## IV.  CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds that Defendant Newman has standing to challenge the search of TVPS. However, the Court finds the search warrant for TVPS was valid and based upon probable cause. Accordingly, the undersigned respectfully **RECOMMENDS** that that Defendant's Motion and Memorandum to Suppress Evidence Obtained at Tennessee Valley Pain Specialists [Doc. 24] be **DENIED**.[9]

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

[9] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

36